UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| MICHAEL CHAPMAN, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| ) | Civil No. 04-103-B-H |
| v. ) | |
| ) | |
| MAINE DEPARTMENT OF ) | |
| CORRECTIONS, et. al, ) | |
| ) | |
| Defendants ) | |

**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT BY PRISON HEALTH SERVICES, INC., MATTHEW TURNER, AND CELIA ENGLANDER**

Michael Chapman, a former prisoner at Bolduc Correctional Facility, has brought a civil rights action pursuant to 42 U.S.C. § 1983 against the facility's medical service provider, a physician's assistant, a physician, and the Commissioner of the Department of Corrections alleging that these defendants violated his constitutional rights through their deliberate indifference to his serious medical needs. Chapman experienced a traumatic injury to the second and third digits of his right hand and as a result of that injury has a permanent impairment. Both the medical defendants and the commissioner have moved for summary judgment. In this recommended decision I address the medical defendants' motion (Docket No. 80) and I recommend that the court grant the motion.

*Applicable Legal Standards*

In analyzing this motion, I construe the record in the light most favorable to Chapman and resolve all reasonable inferences in his favor. Braga v. Genlyte Group,

Inc., 420 F.3d 35, 38 (1st Cir. 2005); Whitlock v. Mac-Gray, Inc., 345 F.3d 44, 45 (1st Cir.2003).  The Court can grant this summary judgment motion only if the record establishes that there is no genuine issue as to any material fact and the defendants are entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Braga, 420 F.3d at 38. The Court "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see also id. at 150-51 ("'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" [Anderson v.] Liberty Lobby, [477 U.S. 242,] 255 [(1986)].). A fact is material if its resolution would "affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," id.

Two United States Supreme court cases frame the constitutional standard for a deliberate indifference claim: Estelle v. Gamble, 429 U.S. 97 (1976) and Farmer v. Brennan, 511 U.S. 825 (1994). Estelle provided that the Eighth Amendment protection places upon the government an "obligation to provide medical care for those whom it is punishing by incarceration." 429 U.S. at 103. The Court observed: "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." id.

In Farmer the Court directed its attention to articulating the standard a plaintiff must meet to hold a prison official liable for Eighth Amendment claims of the type framed by Chapman. It identified two prongs. First, the deprivation alleged must be "objectively 'sufficiently serious.'"  511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S.

294, 298 (1991)). Second, under Farmer, the defendant must have a culpable state of mind, which means that the defendant was deliberate in his indifference to the inmate's health or safety. Id. If the course of treatment amounts, at the most, to no more than negligence or medical malpractice there is no constitutional violation. See Daniels v. Williams, 474 U.S. 327, 335-36 (1986) (noting that 42 U.S.C. § 1983 provides a right of action for civil rights violations and cannot be used to sue correctional officials for negligence).

### *Statement of Material Facts*

Michael Chapman sustained a traumatic injury to his right hand on June 15, 2002, while incarcerated at the Bolduc Correctional Facility. The injury occurred while Chapman was working at a table saw. He was transported to the PenBay Medical Center for treatment on that day. (Defs.' SMF ¶ 1; Pl.'s SAMF ¶ 2.)[1] Chapman returned to Bolduc that same day after surgical amputation of the right index finger to the first joint with application of an aluminum volar gutter splint, suture of a deep laceration to the right middle finger with application of a stack splint, and primary repair of long extensor tendons along with a suture to a laceration of the right ring finger. (Defs.' SMF ¶ 3; Pl.'s SAMF ¶ 4.) Dr. Beauchesne, the orthopedic surgeon at the hospital, explained to Chapman both at the emergency room and in a later follow-up visit that the splint on his injured middle finger was to stay in place for six weeks. (Defs.' SMF ¶ 2.)

Upon Chapman's return to the facility he was observed to have a superficial wound on the third finger of his right hand that was dressed with a Band-Aid. The

---

[1] Chapman identifies this document as "Plaintiff's Reply Statement of Material Facts" or for docketing purposes as a "response to statement of fact." (Docket No. 88.) As Chapman's statement of material fact is not responsive to the defendants', in accordance with the terminology set forth in Local Rule 56 I have referred to this document as Plaintiff's Statement of Additional Material Facts.

middle and forefingers of the right hand were fully dressed, covered in stocking net, and metal splints were on these two fingers. The nurse's note at that time indicated that, per the inmate, the middle finger was able to be sutured but that the index finger required surgical amputation to the first knuckle. (Defs.' SMF ¶ 3.) Chapman was seen again the next day, June 16, 2002. At that time, according to the record, his dressings were changed, the wounds cleansed and covered with an antibiotic ointment, and the splints replaced. It was noted that the sutures were clean and intact and that there was some sanguineous weeping of the wounds when the old dressing was removed. Also on that day, Chapman received an oral antibiotic and Motrin 800 mg for pain and inflammation. The Motrin was a single dose prescription until Ultram, the pain reliever prescribed by Dr. Beauchesne, could be obtained. (Defs.' SMF ¶ 4.)

Matthew Turner, a physician's assistant employed by PHS saw Chapman on June 17, 2002. Chapman reported that his dressing had fallen off. Turner discussed pain medication with the inmate. Since he was incarcerated at the Bolduc Facility, a minimum security facility and work release center, the policy of the Department of Corrections was that inmates at Bolduc are not allowed any narcotic medication. Turner offered Chapman the option of returning to the Maine State Prison and receiving a narcotic analgesic prescription, but Chapman declined to do this. Turner continued to prescribe Ultram for Chapman's pain; this was the strongest pain reliever he could prescribe for an inmate at Bolduc.[2] Also on that date, Turner changed his dressings and applied antibiotic ointment to his wounds. There is no mention in the record of splints and Turner does not recall if

---

[2] The parties dispute whether Turner realized that Ultram, the pain medication prescribed by Dr. Beauchesne, was a non-narcotic. The point is, ultimately, Turner received the Ultram and there is nothing in the record that even remotely suggests that Chapman was a "drug seeker." (Defs.' SMF ¶ 26; Pl.'s Resp. SMF ¶ 26.)

4

they were on Chapman's fingers that day. (Defs.' SMF ¶ 5.) Chapman qualifies this assertion by noting Turner's progress note dated June 17, 2002, indicates that Chapman stated "dressing fell off . . .mod[moderate] amt [amount] bloody drainage on dressings." From this statement the factfinder could infer that whatever had fallen off had at least been retained and view by Turner. (Pl.'s Resp. SMF ¶ 5.) Chapman was seen again on June 19, 2002. The nurse's note indicates that Chapman's dressings had come off, that the sutures remained intact, and that there was fresh blood around the amputation site on the index finger but no sign of infection. The nurse replaced the dressings, reapplied a protective cap, and taped it in place. (Defs.' SMF ¶ 6.)

Chapman was transported to the office of Dr. Beauchesne, the orthopedic specialist who treated him initially, for a follow-up visit on June 21, 2002. A note of that consultation was provided by Dr. Beauchesne's office. It stated that Chapman's wound was healing without signs of infection. The note ordered a further wound check in a few days and suture removal at twelve days to two weeks. It stated that the patient was to remain in the splint for six weeks and that antibiotics were to continue for ten days from the date of injury. It is the usual practice of the medical department when an inmate returns from a consultation with a specialist outside the prison that a nurse will review with the inmate any orders or instructions given by the specialist. (Defs.' SMF ¶ 7.) Dr. Beauchesne further noted that Chapman should return for a follow-up within two to three days, suture removal could occur at twelve to fourteen days post-operative, antibiotic therapy was to continue for ten days from the date of injury, and the stack splint was to be removed six to eight weeks after the date of surgery. Jo Anne Laggan, the prison nurse, did go over Dr. Beauchesne's orders and explained them to Chapman. (In his

5

response to this paragraph Chapman denies that Laggan went over the orders with him, however, there is no record citation for this denial.)   There is no dispute that PHS received the order from Dr. Beauchesne's office.  (Pl.'s SAMF ¶ 5; Defs.' Reply SMF ¶ 5.)

Chapman was seen again at Pen Bay Orthopaedics, this time by Stephen Bennett, PA-C., on June 24, 2002.  The consultation note from that visit states that the wound was granulating nicely without signs of infection. It ordered follow-up twelve to fourteen days post repair for suture removal and dressing change. (Defs.' SMF ¶ 8.)  Bennett noted that Chapman arrived "with a stack splint on his long finger and an aluminum volar gutter splint to his index finger."  (Pl.'s Resp. SMF ¶ 8.)  A referral to Dr. Beauchesne was requested for suture removal and dressing change on June 28, 2002.  However, Dr. Englander, the medical director, did not approve this referral.   Instead, Turner removed the inmate's sutures and changed his dressing on June 27, 2002. This procedure was well within the scope of Turner's competence as a physician's assistant. Turner also continued the prescription for Ultram and an antibiotic, Keflex. In his note of that encounter, Turner does not mention the finger splints and he does not recall if Chapman had them in place at the time. (Def.'s SMF ¶ 9.)  Chapman did not have a problem with Turner performing the suture removal and experienced no difficulties with the procedure.  (Defs.' SMF ¶ 10.)

The defendants indicate that Chapman's version of the events surrounding the splint is that on June 28, 2002, when he had his sutures removed by Turner, the nurse, Jo-Ann Laggan, did not replace the splint and told him he did not need it, as his finger was not broken. (Defs.' SMF ¶ 11.)  Turner was present when this occurred.  Chapman assumed this instruction had been cleared with his surgeon because he knew the

6

instructions were to maintain the stack splint for six to eight weeks. (Pl.'s SAMF ¶ 8.) Turner was sitting in the examining room immediately to Chapman's right doing paperwork when Chapman inquired with Laggan about the splint. Chapman had no reason to mention the non-replacement of the splint to Turner. (Pl.'s Resp. SMF ¶ 12.)

Turner saw Chapman again on July 8, 2002. Chapman reported that he did not feel the Keflex was effective. He reported some pain in the distal ends of his right second and third fingers. Turner observed some minor swelling and that the fingers were pink with a small amount of bloody drainage. Turner could not extend the distal phalanx of Chapman's third finger. Turner's note does not indicate whether the inmate was still using the splint at that time and he does not recall whether it was present. However, after reviewing the records again prior to his deposition, Turner believes the splint was removed prior to the July 8, 2002, visit because at that time the inability to extend the finger had already developed. Turner prescribed a different antibiotic, Augmentin, at that time. (Defs.' SMF ¶ 13.)

On July 13, 2002, Chapman put in a sick call slip requesting renewal of his pain medication. (Defs.' SMF ¶ 29.) Englander saw Chapman in follow-up on July 24, 2002. (Id.) Chapman told Englander that his finger was still sore at the knuckle and that he felt it was infected. Englander said nothing about prescribing pain medication but told Chapman that she was going to refer him to Dr. Beauchesne for evaluation. Pain medication was not discussed further. (Id.) Englander's note indicates that she questioned an indolent infection. (Defs.' SMF ¶ 14.) On August 1, Joanne Laggan secured an appointment with Dr. Beauchesne's office for September 10, 2002. (Id.) Chapman qualifies this statement by noting that Englander also noted a question

7

regarding tendon damage, damage to the nail bed, and continuing pain after six weeks post-operative. She did not order that he receive any pain medication. (Pl.'s Resp. SMF ¶ 14.) Sometime in August 2002, Chapman's mother observed his finger during a visit and expressed her concern to the prison authorities that the finger was infected. Following his mother's complaint, Chapman was seen by some medical provider at the prison. (Pl.'s Resp. SMF ¶ 15.) No additional referral to an outside medical provider was made at that time. (Id.)

For unknown reasons, prison security failed to transport Chapman to his scheduled appointment with Dr. Beauchesne on September 10, 2002. The appointment was rescheduled to September 30. On September 19, 2002, Dr. Beauchesne's office called to reschedule the appointment to October 8. (Defs.' SMF ¶ 16.) Dr. Beauchesne saw Chapman on October 8, 2002. At that time he noted that Chapman had lost active extension of the distal interphalangeal joint of the middle finger and that he was developing a "swan neck" deformity. According to Dr. Beauchesne's note, "the prison" had removed his stack splint at approximately twelve days after the injury. It was also noted that the nail had not grown back fully. X-ray studies taken at the time showed no bony mallet finger, but that the distal interphalangeal joint was flexed. Dr. Beauchesne's assessment was chronic mallet finger and problematic nail growth at the distal tip. Dr. Beauchesne discussed the possibility of fusion of the interphalangeal joint and offered Chapman an evaluation by Dr. Olehnik, a hand surgeon, to be scheduled at Chapman's convenience. Chapman's visit to Dr. Beauchesne on October 8, 2002, generated no specific reference to a discussion of an infection. (Defs.' SMF ¶ 17.)

After receiving the notes of the October 8, 2002, consult with Dr. Beauchesne, Turner wrote a note in Chapman's chart indicating that Chapman had himself removed the splint, apparently against medical advice, prior to that date. This note is the first mention in the chart of the splint's removal. (Pl.'s Resp. SMF ¶ 13.) On November 18, 2002, someone named Janet from the Maine State Prison called Dr. Beauchesne's office to schedule surgery for Chapman. Dr. Beauchesne's office returned the call, but had not heard back from the prison. The surgery never occurred. (Pl.'s Resp. SMF ¶ 17.)

Chapman was evaluated by Dr. Olehnik on December 10, 2002. In his note on that visit, Dr. Olehnik indicated that he would not (surgically) address the mallet deformity, as Chapman's function was good and he was not experiencing pain from this. He discussed possible minor surgery to treat the problems with his fingernail. (Defs.' SMF ¶ 18.) When Dr. Olehnik assessed Chapman's finger in December 2002, he told Chapman he could fuse it straight or leave it crooked. Chapman chose not to have a fusion because he felt the finger would be more functional the way it was. The defendants indicate that Chapman agrees with Dr. Olehnik's assessment of December 10, 2002, that Chapman was in no pain and that the function of his middle finger was good. (Defs.' SMF ¶ 19; Chapman Dep. at 45.) Dr. Olehnik also offered surgery to revise the damaged fingernail on the middle finger. Chapman believes Dr. Olehnik was going to remove the entire remaining nail. Dr. Olehnik said he could not guarantee that the nail would ever grow back. In his note, Dr. Olehnik states, "This is surely an elective procedure that could be done at any point." (Defs.' SMF ¶ 20.)

Dr. Englander referred Chapman to Dr. Beauchesne's office for surgical evaluation. The nail procedure was scheduled for February 3, 2003. Defs.' SMF ¶ 21. Dr.

9

Englander does not know why the surgery did not go forward. It happened from time to time that scheduled outside medical appointments did not go forward because security failed to transport the patient, either because of some emergency coming up or simple mistake. (Defs.' SMF ¶ 22.) Chapman was released from custody on February 12, 2003. (Defs.' SMF ¶ 23.)[3] He has not sought treatment for his damaged fingernail since his release because the nail has partially grown back, it no longer bothers him, and there is no need for further treatment. (Defs.' SMF ¶ 24.)[4]

Turner has personally observed the swan neck deformity in Chapman's middle finger that resulted from his injury, and he has reviewed Dr. Olehnik's assessment of it. The deformity consists of a slight contraction of the outermost joint of the middle finger, which causes the finger tip to bend in slightly toward the palm. According to Dr. Olehnik's assessment, this condition does not cause pain to Chapman, nor does it seriously interfere with his functioning. Based on his own observations, Turner agrees with that assessment. Turner does not consider the swan neck deformity in the inmate's middle finger a serious medical condition. (Defs.' SMF ¶ 25.) Dr. Beauchesne has determined that Chapman's permanent deformity "leads to a 45% impairment of the finger, 18% for the hand, 16% for the upper extremity, and 10% whole person impairment." (Pl.'s Resp. SMF ¶ 25.)

During the period of Chapman's incarceration, he missed some doses of his medications, including the pain reliever, when he failed to awaken for early morning

---

[3] Chapman notes in his statement of additional facts that according to Maine D.O.C. Sentencing Documents his projected release date was June 8, 2003. (Pl.'s SAMF ¶ 21.) I would surmise he wants an inference drawn that the prison officials released him to avoid the cost of surgery, but such an inference hardly seems warranted given the more likely probability that good time allowances resulted in the new release date. Furthermore, this fact is hardly relevant to PHS and the medical defendants as there is no suggestion that they would have any role in making determinations regarding release dates.

[4] Chapman attempts to qualify this statement by noting: "This is true of the fingernail, but not the mallet deformity." (Pl.'s Resp. SMF ¶ 24.) However, there is no record citation for this statement.

medication call at 5:30 a.m. If he did miss doses of pain medication, it was because he did not need it at the time and the pain was not sufficiently strong to awaken him. (Defs.' SMF ¶ 27.)  The pain did prevent Chapman from working and it gradually decreased over time.  Part of the reason Chapman was able to keep working is that he used his left hand to compensate for the impairment in his right finger.  (Defs.' SMF ¶ 28; Pl.'s SAMF ¶ 28.)

Chapman lists five additional statements of material fact, three of which pertain to the Leonard Sherwood Affidavit.  While admitting that Sherwood worked for PHS at the Maine Correctional Center (not Bolduc or the Maine State Prison), the medical defendants object to these paragraphs for a variety of reasons.  The other two paragraphs pertain to Commissioner Magnusson's role in this matter.  Once more, the medical defendants object.  (Pl.'s SAMF ¶¶ 23-27; Defs.' Reply SMF ¶¶ 23-27.)  I sustain their objections.  I have discussed the assertions in these paragraphs further in the recommended decision addressing the Commissioner's motion for summary judgment.

## *Discussion*

The gravamen of Chapman's complaint against Turner and Dr. Englander is that they failed to order continued use of the finger splints prescribed by Dr. Beauchesne, they failed to prescribe adequate pain medication, and they failed to make the necessary arrangements for Chapman's consults with doctors/surgeons outside of the prison.  Chapman's claim against PHS is based upon the corporation's supervisory liability for its employees and upon the theory that it developed a "cost containment" policy or practice that deprived prisoners, including Chapman, of necessary surgery and outside consultations involving their serious medical needs.

11

### *Turner and Englander*

Viewing this evidence most favorably to Chapman, it is certainly possible to find that Turner negligently disregarded, or allowed Nurse Laggan to disregard, Dr. Beauchesne's instructions regarding the continued use of the splint during the healing process. Turner's note of October 24, 2002, is the very first time he makes reference to the splint's absence, following on the heels of Dr. Beauchesne's note regarding the untimely removal of the splint by prison medical personnel. This notation certainly suggests that Turner is attempting to deflect blame for the deformity from himself to Chapman. However, giving Chapman the benefit of this inference, that fact alone does not make him guilty of deliberate indifference to a serious medical need. The record establishes that Turner treated the wound, changed the dressings, prescribed antibiotics, and provided a prescription for Chapman's preferred pain medication. Such a course of conduct is not consistent with deliberate indifference to serious medical needs within the meaning of <u>Farmer</u>. That Turner did not appreciate the need for continued use of the splint can be inferred from the evidence, if the evidence is view in the light most favorable to Chapman, but that fact does not amount to deliberate indifference.

There is not a genuine dispute that Turner or Englander was responsible for the failure to transport Chapman and the delay in scheduling appointments. Nor is either medical provider responsible for any "infection" to the wound. They treated the infection with antibiotics when they diagnosed it and Englander stopped further antibiotic therapy when she had reason to question whether the pain was caused by an infection. Instead she referred Chapman for a surgery consult with an outside provider, a perfectly reasonable course of action. Actually, on the facts before me, Englander's involvement in

12

this case was quite minimal. From this record a factfinder could conclude that Chapman did not receive the best possible medical follow up care from Turner and Englander, but there is simply insufficient evidence to support a claim of deliberate indifference.

*Prison Health Services*

Without an underlying constitutional violation of Chapman's rights, there can be no recovery for him on a theory that PHS's policy or custom was the animating force behind a constitutional violation. See Brown v. Pennsylvania, 318 F.3d 473, 482-83 (3d Cir. 2003). PHS would be subject to municipal liability the same as a town or county would be subject to such liability. If PHS is a state actor for purposes of 42 U.S.C. § 1983 under the holding of West v. Atkins, 487 U.S. 42 (1988), then it cannot be held vicariously liable for the conduct of its employees. Taylor v. Plousis, 101 F.Supp.2d 255, 263 n.4 (D.N.J. 2000)(collecting cases). Chapman would have to show that Tuner and Englander committed a constitutional violation because of a policy or custom promulgated by PHS. Not only has Chapman failed to show that either treating medical practitioner violated his constitutional rights, but the most serious misconduct he alleges, the ill advised removal of the splint, was certainly not done as the result of any PHS policy or custom.

Chapman's contentions appear to be that PHS has a policy or custom of delaying surgeries, avoiding referrals to outside consultants, and failing to prescribe necessary pain medications. Even if these are the policies of PHS, those policies did not deprive Chapman of treatment for a serious medical need. In this case he was taken to an outside consultant to have his wound treated. The removal of the sutures was done in-house, but the record fails to support any inference that procedure was done improperly or with

13

increased pain. The delay in Chapman's ultimate surgery does not appear to have been in deprivation of any serious medical need. The fingernail problem eventually resolved itself and Chapman never had the surgery. The surgery for the finger deformity was an elective procedure that could have been performed at any time. Chapman did receive the pain medication prescribed by Dr. Beauchesne initially and although his pain continued, it obviously was not totally debilitating as Chapman was able to work, sleep, and attend to his activities of daily living. In these circumstances it does not appear that any serious medical need within the Farmer definition was left unattended.

Turning to the supervisory liability claim against PHS -- as distinct from the policy or custom claim -- Chapman attempts to show that PHS knew or should have known that Englander and Turner would be negligent in their treatment of Chapman. According to Chapman that imputed knowledge constitutes the "affirmative link" necessary for imposing supervisory liability under 42 U.S.C. § 1983. A supervisor is only liable "for an Eighth Amendment violation when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation." Boyd v. Knox, 47 F.3d 966, 968 (8th Cir.1995) (footnote omitted). "The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." Jones v. City of Chicago, 856 F.2d 985, 992 -93 (7th Cir. 1988). The "affirmative link" requirement "contemplates proof that the supervisor's conduct led inexorably to the constitutional violation." Hegarty v. Somerset County, 53 F.3d 1367, 1379 (1st Cir. 1995). In this case, as noted above, there was no constitutional violation, but even if

Turner's conduct in allowing the splint to be removed rose to the level of a constitutional violation, PHS, cum his "supervisor," is certainly not inexorably linked to that decision.

*Negligence Claims as to all Medical Defendants*

To the extent Chapman is suing any of these three defendants for negligence, malpractice, or medical decisionmaking other than allegations of deliberate indifference to a serious medical need within the Farmer framework, he must comply with the Maine Health Security Act, 24 M.R.S.A. § 2501, et. seq. A plaintiff may not proceed in this court without complying with the law's prelitigation notice and screening provisions. See Hewett v. Inland Hosp., 39 F.Supp.2d 84 (D. Me. 1999).

*Conclusion*

Based upon the foregoing I recommend the court **GRANT** the medical defendants' motion for summary judgment (Docket No. 80).

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

December 14, 2005.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge